# EXHIBIT 1

**ELECTRONICALLY FILED**
**Superior Court of California**
**County of Sonoma**
**7/10/2025 12:48 PM**
**By: Ryan Carle, Deputy Clerk**

1

2

3

4

CROSNER LEGAL, P.C.
Michael T. Houchin (SBN 305541)
mhouchin@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

5    *Attorneys for Plaintiff and the Proposed Class*

6

7

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                **FOR THE COUNTY OF SONOMA**

9

10   AMAANI SANWARI, individually, and on    Case No.    25CV04862
     behalf of all others similarly situated,

11                                            **CLASS ACTION COMPLAINT FOR:**
              Plaintiff,

12                                                1.  **Violations of the Consumers Legal**
          v.                                          **Remedies Act, Cal. Civ. Code § 1750,**
                                                      **et seq.; and**
13   LUMINARY BRANDS, LLC,

14            Defendant.                           2.  **Violations of the Unfair Competition**
                                                      **Law, Cal. Bus. & Prof. Code §§**
15                                                    **17200, *et seq.***

16

17                                            **JURY TRIAL DEMANDED**

18

19

20

21

22

23

24

25

26

27

28

CROSNER LEGAL, P.C.

### INTRODUCTION

1.      Defendant Luminary Brands, LLC ("Defendant" or "Luminary") sells a line of shampoo products under the Andalou Naturals brand that purport to contain plant stem cells, such as "Argan Stem Cells." (the "Products"). Defendant represents that the Products contain "Argan Stem Cells"  that provide "Age Defying" benefits. For example, Defendant represents that "PhytoCellTec Argan Stem Cells support vitality for stronger strands with less breakage[.]"

2.      Unfortunately, Defendant misleads consumers. Defendant fails to disclose that the Products do not contain live stem cells. Instead, the plant stem cells in the products are dead and have no effect on the skin's epidermis cells or on hair cells. Accordingly, the plant stem cells in the Products do not provide any "Age Defying" benefits as advertised.

3.      Plant stem cells, such as those contained in the Products, even when alive, do not have any remedial effects on human cells when topically applied to the skin. The plant stem cells contained in the Products do not survive in their active form and, therefore, cannot provide any "Age Defying" effects. Thus, Defendant's stem cell claims are patently false and Defendant's claim that the Products contain plant stem cells that are capable of providing "Age Defying" benefits is misleading to consumers.

4.      Plaintiff Amaani Sanwari ("Plaintiff") now brings this action seeking redress for Defendant's false advertising and deceptive conduct.

### JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to Article VI, Section 10 of the California Constitution and California Code of Civil Procedure § 410.10.

6.      This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant is a California limited liability company that maintains its principal place of business in California. Defendant, on its own and through its agents, is responsible for the formulation, ingredients, manufacturing, labeling, marketing, and sale of the Products in California, specifically in this county. The marketing of the Products, including the decision of what to include and not include on the

labels, emanates from Defendant. Thus, Defendant has intentionally availed itself of the markets within California through its advertising, marketing, and sale of the Products to consumers in California, including Plaintiff. The Court also has specific jurisdiction over Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it reasonable for Defendant to defend this lawsuit because it has sold harmful Products to Plaintiff and members of the Class in California. By distributing and selling the Products in California, Defendant has intentionally expressly aimed conduct at California which caused harm to Plaintiff and the Class which Defendant knows is likely to be suffered by Californians.

7.    Venue is proper in this county pursuant to Cal. Civ Code. § 1780(c) because Defendant is doing business in this county as the Products are offered for sale in this county.

### PARTIES

8.    Defendant Luminary Brands, LLC is a California limited liability company that maintains its principal place of business in Petaluma, California. Throughout the Class Period defined herein, Defendant was the manufacturer and distributor of the Products.

9.    Plaintiff Amaani Sanwari is a resident of California. Plaintiff purchased Defendant's Andalou Naturals Argan Stem Cell Shampoo during the class period from an online retailer. Plaintiff saw and relied on the "Age Defying" claim on the labels of the Products. Plaintiff also saw and relied on the statement that "PhytoCellTec Argan Stem Cells support vitality for stronger strands with less breakage" and the statement that the Products have "Nature's Intelligence Fruit Stem Cell Science®." Plaintiff would not have purchased the Product, or would have paid less for the Product, had she known that the products do not contain live stem cells that can provide "Age Defying" benefits. As a result, Plaintiff suffered injury in fact when she spent money to purchase the Products she would not have purchased, or would have paid less for, absent Defendant's misconduct. Plaintiff desires to purchase the Products again if the labels of the products were accurate and if the products actually contained live plant stem cells that are capable of providing "Age Defying" benefits.  However, as a result of

CROSNER LEGAL, P.C.

Defendant's ongoing misrepresentations, Plaintiff is unable to rely on the Product's advertising and labeling when deciding in the future whether to purchase the Products.

<u>**FACTUAL ALLEGATIONS**</u>

**THE ANDALOU NATURALS PRODUCTS**

10.     The front label for each of the Products prominently states that the Products contain "Argan Stem Cell" thereby leading reasonable consumers to believe that the Products contain live and active plant stem cells. The front label of the Products further states that the Products provide "Age Defying" benefits as shown below.



11.    The back label of the Products further touts the benefits of the plant stem cells in the Products by stating that "PhytoCellTec Argan Stem Cells support vitality for stronger strands with less breakage" as shown below. The Products also state that there is "Nature's Intelligence Fruit Stem Cell Science®," which gives reasonable consumers the impression that the plant stem cells are scientifically capable of affecting the skin and hair.



**THE PLANT STEM CELLS IN THE PRODUCTS HAVE NO EFFECT ON THE SKIN OR HAIR**

12.    Defendant's claim that the plant stem cells in the Products provide "Age Defying" and other benefits is false and misleading. Moreover, Defendant fails to disclose that the plant stem cells in the Products are no longer alive and have no effect on the human skin or hair.

13.    The idea behind stem cell therapy is that living stem cells can help rebuild and repair human organs. Stem cells are living undifferentiated biological cells that can become specialized cells in human organs and, in turn, divide and produce more healthy specialized cells. Like human stem cells, living plant stem cells have the ability to self-renew and replace specific cells in plants that are in need of repair. However, living plant stem cells are not found in beauty products and even if they were, they would not have the capability to differentiate into specialized human skin cells.

14.    Paolo U. Giacomoni, a former executive director of research at Estee Lauder, who received a Laurea in Atomic Physics from the University of Milan and a Ph.D. in Biochemistry from the University of Paris, is critical of the role of stem cells in cosmetics. "Stem cell technology is still far from biomedical applications, let alone cosmetic ones," states Giacomoni.[1]

15.    The Products do not actually contain any living plant stem cells among their ingredients. Rather, the Products contain an ingredient referred to as "Argan Stem Cells," and consisting of deceased plant stem cells.

16.    Stem cell culture is a delicate process requiring temperature-controlled incubators and a constant supply of growth factors presented to the cells in specially-formulated sterile media. Stem cells die quickly after removal from such sterile conditions. After cell death, the cells are quickly broken down by enzymatic, chemical and bacterial means. To assert that any cosmetic product could contain anything resembling a "stem cell" after undergoing the

---

[1] Andrea Rinaldi, *Healing beauty? More biotechnology cosmetic products that claim drug –like properties reach the market*, EMBO REPORTS (Nov. 2008) *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2581859/.

CROSNER LEGAL, P.C.

manufacturing process, which adds dozens of additional herbal and chemical components, is a patently absurd falsehood that seeks to prey on the average consumer's ignorance of cell biology.

17. Moreover, even living plant stem cell extracts are unable to provide any effect on the skin, including "Age Defying" effects, as Defendant claims. Rather, plant stem cell extracts likely do not interact with human stem cells at all. Jörg Gerlach, M.D., Ph.D., Professor of Surgery at the University of Pittsburgh, stated "[s]tem cells need specific nutrition via blood supply in the tissue to survive and function— if they were layered onto intact skin the stem cell would just die."[2]  His conclusion has been echoed by other leading experts in the fields of medicine and biology. For example, a leading Professor of Botany at Oxford University was quoted by *The Daily Mail* as saying, "I don't see how plant stem could interact with human stem cells in this way."[3] Even some leading proponents of plant stem cells admit that the "anti-aging benefits to the skin after topical application of plant stem cells could not be confirmed in a clinical trial."[4]

18. Likewise, Dr. Waleed Ezzat, MD, a facial reconstructive surgeon at the Boston Medical Center was quoted by Boston Magazine saying, "The bottom line is that there is no conclusive scientific data that absorbing stem cell extracts from a cream can really reverse the aging process. My advice is that a good cream is a good cream. But if the advertising seems to [sic] good to be true, it most likely is. Buyer beware."[5]

---

[2] *See* Brooke Borel, *Stem Cell Skincare: Fact or Fiction? A growing list of beauty creams boast they can reverse wrinkles and defy age with the help of stem cells, but none have the science to back up the claims*, YOU BEAUTY, Oct. 17, 2011, *available at* http://www.youbeauty.com/skin/stem-cells-skincare.

[3] *See* Leah Hardy, *Could the extract form a rare swiss apple REALLY get rid of your wrinkles?*, DAILY MAIL, Nov. 30, 2009, *available at* http://www.dailymail.co.uk/femail/article-1231889/Could-extract-rare-Swiss-apple-REALLY-rid-wrinkles.html.

[4] *Id.*

[5] *Ask a Doctor: Do Stem Cell Face Creams Really Work? A facial plastic surgeon tells us the truth behind the stem cell face cream marketing hype*, BOSTON MAGAZINE, Jan. 8, 2013, *available at* http://www.bostonmagazine.com/health/blog/2013/01/08/stem-cell-face-creams/

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

19.    Dr. Michael Pirrung, Ph.D., an expert in stem cells, submitted an expert report in a similar matter titled *Miller v. Peter Thomas Roth, LLC, et al.*, Case No. 19-cv-000698-WHA (N.D. Cal.). *See* Exhibit A attached hereto. In his expert report, Dr. Pirrung stated that "[a]ny cell (animal or plant, stem cell or not) in a topically applied cosmetic cannot affect cells in skin, because the barrier function of skin prevents those cells from penetrating to the level of living cells, as well as the barrier function of the plasma membrane / cell walls of the (putative) therapeutic cells preventing the escape of cell contents. If a plant stem cell were to penetrate the stratum corneum, like any invading organism (an infective bacteria or parasite) it would be recognized by the human immune system as foreign and be destroyed." *See* Ex. A.

20.    Accordingly, Defendant's claim that the stem cells in the Products provide "Age Defying" effects is false and misleading.

**REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S MISREPRESENTATIONS AND OMISSIONS**

21.    Consumers, like Plaintiff, relied on Defendant's labeling statements that the Products contain plaint stem cells and that the Products will provide "Age Defying" effects.  The net-effect or net-impression of the Products' labeling on consumers is that the Products contain live and active stem cells that will provide "Age Defying" effects.

22.    Defendant's nondisclosure of the fact that the Products do not contain live and active stem cells is material to reasonable consumers in determining whether to purchase the Products. Defendant has exclusive knowledge that the Products do not contain live and active plant stem cells. The fact that Defendant's Products contain dead plant stem cells is not reasonably accessible to Plaintiff and consumers.

23.    A failure to disclose a fact constitutes actionable conduct if the omission goes to the central function of the product. Here, the Products' central function is to provide "Age Defying" benefits. However, the Products do not contain live plant stem cells and the dead plant stem cells in the Products do not have any effect on the human skin. Reasonable consumers, like Plaintiff, would deem it important in determining whether to purchase the Products because Plaintiff would not have purchased the Products had she known that the Products do not contain live plant stem cells.

CROSNER LEGAL, P.C.

24.     Defendant also made partial representations that the Products contain plant stem cells, such as labeling the Products as  containing "Argan Stem Cell." These partial disclosures are misleading because the Products do not contain live plant stem cells and the dead plant stem cells in the Products have no effect on the human skin.

**CLASS ACTION ALLEGATIONS**

25.     Plaintiff brings this action as a class action pursuant to Cal. Code. Civ. Proc. § 382 on behalf of the following Class:

California Class
All persons who purchased the Products for personal use in California within the applicable statute of limitations until the date class notice is disseminated.

26.     Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

27.     Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate sub-classes, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

28.     The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

29.     Numerosity: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

30.     Commonality: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.     Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.      Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Products;

c.      Whether Defendant made material omissions concerning the Products that were likely to deceive the public;

d.      Whether Plaintiff and the Class are entitled to injunctive relief;

e.      Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

31.     <u>Typicality</u>: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

32.     <u>Adequacy</u>: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

33.     The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.      The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.     The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.     When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.     This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.     Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.     This class action will assure uniformity of decisions among Class Members;

g.     The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.     Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

34.     Additionally or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

35.     Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and Class members.

36.     Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

CROSNER LEGAL, P.C.

**FIRST CAUSE OF ACTION**

**Violation of California's Consumers Legal Remedies Act**

**Cal. Civ. Code § 1750 *et seq.***

37.     Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

38.     Plaintiff brings this claim under the CLRA individually and on behalf of the Class against Defendant.

39.     At all times relevant hereto, Plaintiff and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d).

40.     At all relevant times, Defendant constituted a "person," as defined in California Civil Code section 1761(c).

41.     At all relevant times, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

42.     The purchases of the Products by Plaintiff and the members of the Class were and are "transactions" within the meaning of California Civil Code section 1761(e).

43.     Defendant disseminated, or caused to be disseminated, through their advertising, false and misleading representations, including the Products' labeling that products contain plant stem cells and will provide "Age Defying" effects. Defendant fails to disclose that the Products do not contain live plant cells and the dead plant stem cells have no effect on the human skin or hair. This is a material omission as reasonable consumer would find the fact that the Products do not contain live and active plant stem cells to be important to their decision in purchasing the Products. Defendant's representations violate the CLRA in the following ways:

a)      Defendant represented that the Product have characteristics, ingredients, uses, and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b)      Defendant represented that the Product are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

c)      Defendant advertised the Products with an intent not to sell the Products as advertised (Cal. Civ. Code § 1770(a)(9)); and

CROSNER LEGAL, P.C.

d)      Defendant represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

44.      Defendant's actions as described herein were done with conscious disregard of Plaintiff and the Class members' rights and were wanton and malicious.

45.      Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the Products have characteristics which they do not have.

46.      Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein. Plaintiff also seeks actual damages, punitive damages, and attorneys' fees and costs for Defendant's violations of the CLRA.

47.      Pursuant to California Civil Code section 1782, Plaintiff sent a written demand letter to Defendant requesting that Defendant remedy the violations alleged herein. More than thirty days have passed since Defendant received Plaintiff's demand letter and Defendant has failed to take any corrective action. Accordingly, Plaintiff seeks actual damages, punitive damages, injunctive relief, and attorneys' fees and costs for Defendant's violations of the CLRA.

48.      Pursuant to section 1780(d) of the CLRA, attached hereto is an affidavit showing that this action was commenced in a proper forum.

## SECOND CAUSE OF ACTION

### Violation of California's Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200 *et seq.*

49.      Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

50.      Plaintiff brings this claim under the UCL individually and on behalf of the Class against Defendant.

51.      The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

52.    Defendant committed unlawful business acts or practices by making the representations and omitted material facts (which constitutes advertising within the meaning of California Business & Professions Code section 17200), as set forth more fully herein, and by violating California's Consumers Legal Remedies Act, Cal. Civ. Code §§17500, et seq., California's False Advertising Law, Cal. Bus. & Prof. § 17500, et seq., 15 U.S.C. § 45, and by breaching express and implied warranties. Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

53.    Defendant committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the members of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising. Plaintiff and the other Class members paid for a Product that is not as advertised by Defendant. Further, Defendant failed to disclose a material fact (that the Products do not contain live and active plant stem cells) of which it had exclusive knowledge. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and material omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

54.    Defendant committed "fraudulent" business acts or practices by making the representations of material fact regarding the Products set forth herein. Defendant's business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Products do not contain high levels of cadmium.

55.    Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's

13

Products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Product and Defendant's unlawful, unfair, and fraudulent practices.

56.     Defendant's wrongful business practices and violations of the UCL are ongoing.

57.     Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

58.     Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Pursuant to California Business & Professions Code section 17203, Plaintiff, individually and on behalf of the Class, seek (1) restitution from Defendant of all money obtained from Plaintiff and the other Class members as a result of unfair competition; (2) an injunction prohibiting Defendant from continuing such practices in the State of California that do not comply with California law; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

## REQUEST FOR RELIEF

Plaintiff, individually, and on behalf of all others similarly situated, requests for relief pursuant to each claim set forth in this complaint, as follows:

a.     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel;

b.     Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

c.     Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

d.     Ordering damages for Plaintiff and the Class;

14

e.    Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

f.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g.    Ordering such other and further relief as may be just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury of all claims in this Complaint so triable.

Dated: July 10, 2025                    CROSNER LEGAL, P.C.

By: _____
MICHAEL T. HOUCHIN

9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
mhouchin@crosnerlegal.com

*Attorneys for Plaintiff and the Proposed Class*

15

CLASS ACTION COMPLAINT

**Affidavit Pursuant to Civil Code Section 1780(d)**

I, MICHAEL T. HOUCHIN, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California. I am one of the counsel of record for Plaintiff.

2.      This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act.

3.      Defendant has done, and is doing, business in California, including in this County. Such business includes the marketing, promotion, distribution, and sale of the Products within the State of California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed July 10, 2025 at San Diego, California.

CROSNER LEGAL, P.C.

By: _____
    MICHAEL T. HOUCHIN

9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
mhouchin@crosnerlegal.com

CROSNER LEGAL, P.C.

16

# EXHIBIT A

1  **GUTRIDE SAFIER LLP**
   ADAM J. GUTRIDE (State Bar No. 181446)
2  SETH A. SAFIER (State Bar No. 197427)
   TODD KENNEDY (State Bar No. 250267)
3  KRISTEN SIMPLICIO (State Bar No. 263291)
   100 Pine Street, Suite 1250
4  San Francisco, California 94111
   Telephone: (415) 639-9090
5  Facsimile: (415) 449-6469
6
7  Attorneys for Plaintiffs

8                    UNITED STATES DISTRICT COURT
9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  KARI MILLER and SAMANTHA              Case No. 19-cv-000698-WHA
    PAULSON, on behalf of themselves, the
11  general public, and those similarly situated,  **DECLARATION OF MICHAEL PIRRUNG,**
    Plaintiffs,                           **Ph.D., IN SUPPORT OF PLAINTIFFS'**
12                                        **OPPOSITION TO DEFENDANTS'**
                                          **MOTION FOR PARTIAL SUMMARY**
13  v.                                    **JUDGMENT WITH RESPECT TO**
                                          **SAMANTHA PAULSON**
14  PETER THOMAS ROTH, LLC; PETER
15  THOMAS ROTH DESIGNS LLC; PETER        Date: December 19, 2019
    THOMAS ROTH GLOBAL, LLC; PETER        Ctrm 12, 19th Floor
16  THOMAS ROTH LABS LLC,                 Time: 8:00 a.m.
                                          Judge: Hon. William H. Alsup
17  Defendants.
18
19
20
21
22
23
24
25
26
27
28

1.      I, Michael Pirrung, Ph.D., hereby declare the following facts.  I am competent to testify to the matters stated herein.

EXPERT QUALIFICATIONS

2.      I received a Bachelors degree with Highest Honors in Chemistry from the University of Texas-Austin in 1975, and a Doctor of Philosophy degree in organic chemistry from the University of California-Berkeley in 1980.

3.      I am an author or co-author of over 170 peer-reviewed papers that include technical subject matter relating to the fields of organic and bioorganic chemistry.

4.      I have performed research using human embryonic stem cells supported by the California Institute of Regenerative Medicine, which was reported at a national meeting of the world's largest scientific society, the American Chemical Society: Kochegarov, A.; Huang, Y.; Biswas, G.; Pirrung, M. C. Differentiation of human embryonic stem cells to dopaminergic neurons by small molecules. Abstracts of Papers, 239th ACS National Meeting, San Francisco, CA, United States, March 21-25, 2010 (2010), BIOT-106.

5.      I have received a number of honors and awards in my field of study. For example, I was a National Science Foundation Presidential Young Investigator in 1985-90, and received the Chemical Pioneer Award from the American Institute of Chemists (2004). I have been elected a fellow of the American Association for the Advancement of Science (1996) and the National Academy of Inventors (2016). I was an Alfred P. Sloan Research Fellow (1986-88) and a John Simon Guggenheim Memorial Foundation Fellow (1994-95). Along with several co-authors, I received the American Association for the Advancement of Science-Newcomb Cleveland Prize for the best paper published in the journal *Science* (1991). For this research, this group of authors also received the Intellectual Property Owners Distinguished Inventor Award (1993) and the European Inventor of the Year Award (2006) for small- and medium-sized enterprises.

1

6.     I held an assistant professor position in the Chemistry Department at Stanford University (1981-89) and was a senior scientist at the Affymax Research Institute, Palo Alto, CA (1989). I was an associate professor and then full professor at Duke University (1989-2004). I was then appointed a UC Presidential Chair in Chemistry at UC-Riverside (2004-09), and in 2012 I was named Distinguished Professor of Chemistry. I also was named a Professor of Pharmaceutical Sciences at UC-Irvine (2013).

7.     I have served on the scientific advisory boards of several biotechnology companies and consulted for many others. I have current or past service on the editorial boards of four scientific journals.

8.     A true and correct copy of my curriculum vitae as of October 1, 2019, which provides further biographical information, is attached to this declaration.


CLAIMS IN SUIT


9.     Mr. Deckner supplied a declaration as an expert for the Defendant. His support for the utility of plant stem cells and products derived from them is a major defense of Peter Thomas Roth. I disagree with essentially all of the conclusions of Mr. Deckner, because he ignores affirmative evidence from studies of stem cells that they cannot work as advertised by Peter Thomas Roth. He provides no properly performed scientific study of the effectiveness of rose stem cells or extracts of those cells for any cosmetic purpose. Such a study would include *objective* measures of the outcome of treatments, measurements of the statistical significance of the claimed effects, and proper controls, including placebo treatments. He does not provide a single example of a substance produced by a rose stem cell and/or found in a rose stem cell extract used in a topical product that has been objectively shown to offer benefits including improving appearance of fine lines and wrinkles, anti-aging, and sagging, as claimed for products of Peter Thomas Roth. He does not cite to any peer-reviewed literature (the highest level of reliability in scientific publication) in support of his assertions concerning rose stem cells or their products. His appeals to purported experts in related technologies are unreliable because their

2

statements were made on behalf of commercial ventures. I will counter his erroneous assertions individually below.

10.     Mr. Deckner presents packaging for the Rose Stem Cell Gel Mask, circa 2015, and in his ¶32 points to several cell extracts in the ingredient list. However, the packaging he presents clearly shows the statement "five perfect rose stem cells". For clarity, it should be noted that this presumably does not refer literally to only 5 cells, but to 5 types of cells, each in unknown numbers. Even today, the website of Peter Thomas Roth (screenshot below) states that this mask includes 5 rose stem cells, as well as 4 rose extracts. This dichotomy makes clear that rose stem cells are distinct from rose extracts.

SKU 1301004   IN STOCK

# Rose Stem Cell Bio-Repair Gel Mask

★★★★★   5.0 (8)

Cutting-edge plant biotechnology isolates and replicates the perfect rose stem cells for maximum anti-aging benefits. With state-of-the-art, 21st century breakthrough stem cell technology, five rose stem cells are blended with four rose extracts in a cooling gel that helps brighten, hydrate and firm for younger-looking skin.

The ingredient list on the website (screenshot below) clearly states in the heading that 5 rose plant stem cells are included, and again distinguishes them from extracts.

## KEY INGREDIENTS

**Five Rose Plant Stem Cells**
Rose Commiphora, Desert Rose,
Damas Rose, Pale Rose and White
Rose help hydrate and improve
the look of aging skin.

**Four Rose Extracts**
Rose Damascena, Rose Canina,
Rose Water and Rose Hip Seed
helps nourish, hydrate and balance
the look of skin.

### ALL INGREDIENTS

Water/Aqua/Eau
Butylene Glycol
Propanediol
Peg-40 Hydrogenated Castor Oil
Trideceth-9
Triethanolmaine
Carbomer
Rosa Centifolia Leaf Cell Extract
Rosa Alba Leaf Cell Extract
Rosa Damascena Leaf Cell Extract
Rosa Canina Fruit Extract
Rosa Damascena Flower Oil
Rosa Canina Fruit Oil
Rose Centifolia Flower Water
Commiphora Myrrha Leaf Cell Extract
Adenium Obesum Leaf Cell Extract

Leuconostoc/Radish Root Ferment Filtrate
Glycerin
Allantoin
Aloe Barbadensis Leaf Juice
Bht
Sodium Pca
Propylene Glycol
Ethylhexylglycerin
Ppg-26 Buteth-26
Ethylhexyl Salicylate
Butyl Methoxydibenzoylimethane
Ethylhexyl Methoxycinnamate
Disodium Edta
Potassium Sorbate
Red 33 (Ci 17200)

11.     Perusing the ingredient list, it is apparent that those that are called 'leaf cell extract'
correspond to the 5 varieties of rose stem cells stated earlier. Mr. Deckner states that Peter
Thomas Roth's ingredients in its stem cell products are isolated from the stem cells, which meets
the definition of an extract. I have been informed that a Dr. Shun testified on behalf of Peter
Thomas Roth regarding the formulation of its Rose Stem Cell products, and testified that they use
stem cell "isolates". Mr. Deckner is a consultant, not an employee, and he may not be familiar
with Peter Thomas Roth's specific manufacturing process or Dr. Shun's testimony. In view of
this contradiction, it is possible that the phrase "cell extract" refers to extraction of cells from rose
leaves, not extraction of contents from stem cells themselves. I have also been informed that Peter
Thomas Roth's supplier for its Rose Stem Cell products is the company Naolys, which is further

4

discussed later in this declaration. Their product literature identifies them as actual stem cells, but names them stem cell extracts.

12. Assuming the Defendant is using whole stem cells rather than extracts of stem cells in its products, as the labels and testimony suggests, all available scientific evidence indicates that these products cannot "repair" skin.[1] The conditions and factors that would affect skin cells are vastly different from those that are involved in plant stem cells, as plants and animals are found in different Kingdoms of Life, taxonomically.[2] Stem cell-based human therapies involve converting a pluripotent cell into one of the specialized cells of the body in a process called differentiation.[3] These cells can be used to replace the same type of cells in the body that have been lost through age or disease. There is no existing human therapy, of any type, that involves stimulating a human stem cell to develop into a specialized cell (like a skin cell).[3] The fact that a plant stem cell is exactly that in the plant from which it comes is meaningless concerning its ability to affect a human stem cell or a human skin cell. Key properties of stem cells are self-renewal and the ability to differentiate to more specialized cells, such as root, fruit, or leaf cells.[4] A plant cell cannot become a human cell.

13. Any cell (animal or plant, stem cell or not) in a topically applied cosmetic cannot affect cells in skin, because the barrier function of skin[5] prevents those cells from penetrating to the level of living cells, as well as the barrier function of the plasma membrane / cell walls of the (putative) therapeutic cells preventing the escape of cell contents.[6] If a plant stem cell were to penetrate the stratum corneum, like *any* invading organism (an infective bacteria or parasite) it would be recognized by the human immune system as foreign and be destroyed.[7]

---

[1] https://www.zwivel.com/blog/stem-cells-in-cosmetic-treatments/, accessed 11/28/19.
[2] Pavlovic, M.; Radotic, K. *Animal and Plant Stem Cells*. Springer International, Cham, 2017.
[3] Knoepfler, P. *Stem Cells: An Insider's Guide*. World Scientific, Singapore, 2013.
[4] Scheres, B. Stem cells: a plant biology perspective". *Cell* **2005**, *122*, 499–504.
[5] Montagna, W.; Parakkal, P. F. *The Structure and Function of Skin*, 3rd Ed. Academic Press, New York, 1974.
[6] Lodish, H.; Berk, A.; Kaiser, C. A.; Krieger, M.; Bretscher, A.; Ploegh, H.; Amon, A.; Scott, M. P. Martin, K. *Molecular Cell Biology*, 8th Ed. W. H. Freeman, New York, 2016.
[7] Punt, J.; Stranford, S.; Jones, P.; Owen, J.; Kuby, J. *Kuby Immunology*, 8th Ed. W. H. Freeman, New York, 2019.

5

14.     Even if Peter Thomas Roth were using extracts of stem cells in its products, available scientific evidence indicates that these products could not work as purported. In topical cosmetic application, those extracts would need to penetrate into the skin (where living cells reside) to have any effects on it. The stratum corneum of skin is hydrophobic and prevents penetration of any substances that would be found in an aqueous extract of plant stem cells.[5] The extract could not get to where it would need to be to work, and even if it could, nothing in a plant cell would be believed to repair cells / skin in a human.[1] This is because of the vast divergence of biology in the two Kingdoms of Life, plant and animal. The substances that are in plant stem cells that make them plant stem cells are fundamentally different from related substances in animal stem cells, and specifically human stem cells, that make them what they are.[2] While there may be growth factors in plant stem cells, they would not work for human cells. These factors are highly specific for cells from a particular organism, and even for differentiated cells within one organism. For example, growth factors for mouse embryonic stem cells are not effective with human embryonic stem cells, and vice versa.[8] Also, growth factors are proteins, and any proteins applied in a cosmetic would not penetrate to the location of living stem cells in the skin. Plant stem cells have also been implied to contain antioxidants that have been used for decades, but these are protective molecules only and do not "repair" skin.[9]

15.     Mr. Deckner in ¶33 states that experts have validated plant stem cell ingredients "like the ones used in the Rose Stem Cell Gel Mask" as having beneficial effects on human skin. He provides no evidence here in support of this assertion, and in fact it is immaterial, since the performance of ingredients *like* those used in this product are meaningless regarding whether the specific ingredients in the Mask are effective. The fact that "real chemical companies" and "real cosmetic and skin care companies" use them (presumably, plant stem cell ingredients *like* rose stem cells) is not scientific evidence of their efficacy. Manufacturers use ingredients that prompt consumers to purchase their products, based on the manufacturer's assertions of their value,

---

[8] Mummery, C.; van de Stolpe, A.; Roelen, B.; Clevers, H. *Stem Cells. Scientific Facts and Fiction*. 2nd Ed. Academic Press, London, 2014

[9] Poljsak, B.; Dahmane, R.; Godic, A. Skin and antioxidants. *J. Cosmetic Laser Therapy* **2013**, *15*, 107-113.

6

which cuts to the heart of this case - a commercial venture making unsubstantiated claims that are used to justify a very large price by comparison to the cost of ingredients of no established value. The herb *Echinacea* has been shown in clinical studies to have zero utility in treating the common cold,[10] but it is still marketed as if it is effective.

16.     The fact that plant stem cell products do not repair or rejuvenate human skin or skin cells is further demonstrated by the US FDA repeatedly asserting that science does not recognize therapeutic or cosmetic uses for plant stem cell products. The FDA has sent warning letters to several cosmetics companies that incorporate plant stem cells into their products and claim effects that would classify them as drugs. For example, Sircuit Skin was warned about its claims that plant stem cells help stimulate collagen production.[11] The FDA also issued a warning letter to a dermatology clinic selling products containing PhytoCellTech *Malus domestica* plant stem cells (made by Mirabelle Biotechnology), one of the primary examples Mr. Deckner offers of the alleged scientific acceptance of plant stem cell efficacy. Unlike its manufacturer's advertisements, the FDA warning letter reflects scientific consensus of the ineffectiveness of these products, applied at the regulatory level.

17.     Mr. Deckner goes on to state that the stem cells in the Mask are not living, agreeing with an assertion in the complaint. This is certainly so, since such cells are very fragile and could not survive outside the specific environment in which they are cultured. No cosmetic benefit could come from dead cells, however, because whatever (putatively) useful ingredients they might have would be trapped inside them and could not affect skin. All cells are distinguished by very large barriers to substances crossing the plasma membrane / cell wall, which would prevent the "passive diffusion" that Mr. Deckner asserts would occur. Even basic college biology textbooks[12]

---

[10] Karsch-Völk, M.; Barrett, B.; Kiefer, D.; Bauer, R.; Ardjomand-Woelkart, K.; Linde, K. Echinacea for preventing and treating the common cold. *Cochrane Database Syst. Rev.* **2014**, 2, CD000530.

[11] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/sircuit-skin-07192016, accessed 11/19/2019 (filed as Exhibit 12 to Decl. Kristen Simplicio in Support of Opp. to Defs' Mot. Partial Summary Judgment for Samantha Paulson).

[12] Lodish, H.; Berk, A.; Kaiser, C. A.; Krieger, M.; Bretscher, A.; PLoegh, H.; Amon, A.; Scott, M. P. Martin, K. *Molecular Cell Biology*, 8th Ed. W. H. Freeman, New York, 2016.

7

discuss secretory pathways that are used by cells to transport a very select subset of proteins to their exteriors. The vast majority of proteins remain inside cells forever, however. Organelles such as the endoplasmic reticulum and Golgi are involved in the export of proteins. They require energy to do so, which comes from the master energy molecule of the cell, ATP. However, ATP is made only in living cells, so the secretory pathway would be unable to function in dead cells.

18.     In ¶37 and beyond, Mr. Deckner describes the general technology area of plant stem cells and their cosmetic uses. He emphasizes an apple stem cell product from a European manufacturer (Mirabelle) while addressing nothing about the utility of rose stem cells. The exhibit (Ex. 6) he uses for support is a review article that presents no original data of its own, and does not cite any peer-reviewed publications that include actual data that bear on the efficacy of plant stem cells or a complete description of the methods used in the studies. His statement that the apple stem cell product has been shown to have beneficial effect on human skin is incorrect. What the review article states is that its efficacy on human skin <u>cells</u> was shown. This is a totally different situation, and the omission of this key word is dishonest. While studies have examined the effect of such extracts on animal cells grown in culture (i.e., in a laboratory), such cells would be bathed in the extracts. In topical cosmetic application, those extracts would need to penetrate into the skin (where living cells reside) to have any effects on it. The stratum corneum of skin is hydrophobic and prevents penetration of any substances that would be found in an aqueous extract of apple stem cells, as mentioned earlier. The extract could not get to where it would need to be to work. The review article even questions whether these cells were actually derived from plant stem cells.

19.     The review article also cites a patent for the apple stem cell product, which is provided as Ex. 9 to Mr. Deckner's declaration. It is US Pat. 8,580,320, Nov 12, 2013. I have reviewed the specification of this patent, which describes dermatological testing of efficacy on human skin. These tests fail the most basic requirements of any clinical study, in that there is no control, nor is there a placebo control, nor is there blinding (that is, whether a patient receives placebo or extract must not be known to the patient *or* the experimenter). The results of that study, presented in Fig. 6 of the patent, include no primary data and give no indication of the statistical significance of the

8

effect claimed. Therefore, the results are simply not credible. Further studies include the effect of this extract on human dermal fibroblasts. These are human skin cells grown in culture. Again, no controls are used. As mentioned above, an effect in this laboratory setting is meaningless concerning the effect an extract might have when topically applied in a cosmetic. It is worth noting that the grant of a patent by the USPTO does not mean that everything in the patent is correct, only that, if true, it supports the claims. There is no checking of the veracity of a patent application by the patent examiner, and indeed, it is possible to receive a patent on an invention that is completely fictitious (called prophetic), along with fictitious examples. Finally, the claims in this patent are all directed to cells subjected to high pressure homogenization, meaning they are broken open to release their contents. If, as is very possible, the Rose Stem Cell products of Peter Thomas Roth are intact cells, nothing in this patent pertains to their efficacy.

20. At ¶41, Mr. Deckner lists constituents of plant stem cells that he believes provide benefits to human skin. The article cited (Ex. 4 to his declaration) only claims that these constituents *may* do so, it does not state that these constituents have been shown to have this effect. Also, these are substances found in all living cells, so why plant stem cells might be useful rather than the billions of other possible cell types is not stated. Finally, this article is authored by scientists at the European company that markets the apple stem cell extract mentioned above. In 2008 when the paper was published, stringent requirements that authors disclose all potential conflicts of interest, common in journals today, were not in force. A skeptical reader at any time, however, would recognize the potential conflict in authors publishing a scientific article on their own product. Finally, studies of the effects of plant stem cell extracts on human stem cells reported in this article were again done in the laboratory setting, which is meaningless concerning their utility in a cosmetic, and in particular irrelevant to the case at hand, because rose stem cells or extracts thereof were not being studied.

21. Mr. Deckner in ¶52 is faulty in criticizing the plaintiff for asserting that dead plant stem cells can have no effect on skin. It is certainly true that plant stem cells, alive or dead, themselves have no demonstrated effects on human skin, and Mr. Deckner himself states that any stem cells in the product are dead. I have verified through an extensive literature search of my own, using

9

powerful bibliographic tools, that there is no record of any scientific study or publication on the effects of rose stem cells on human skin and/or in a cosmetic. Making an extract from a plant cell certainly destroys or kills those cells. Mr. Deckner further says that plant stem cell products work by "passive diffusion" of active molecules out of the cells into surrounding tissue. This is not plausible, as all cells have large barriers to substances crossing the plasma membrane / cell wall.

22.     In ¶53, Mr. Deckner provides a laundry list of 'reputable' companies that have demonstrated efficacy of plant stem cell ingredients on human skin, detailed in Ex. 10, 12-20. I have reviewed each of these exhibits, and they are nothing more than marketing materials in support of their commercial products, or even just catalog pages. These provide no credible scientific validation concerning efficacy. Some make fantastic claims concerning modes of action (inhibition of microRNA, inclusion of epigenetic factors) that are neither supported in the materials themselves or by any other credible studies. Studies by Mibelle and Sederna repeat the error discussed above of extrapolating studies of the effects of extracts on cells in the laboratory to topical use on skin. Some materials covered include alpine rose stem cells, which might be mistaken for the cells in the Peter Thomas Roth products in suit. However, alpine rose is a common name for *Rhododendron ferrugineum*, which is not a rose at all. Its cells are claimed by Mibelle to be rich in special proteins, dehydrins, that preserve moisture. As discussed earlier, even if such proteins were present in alp rose extracts, they could not penetrate to skin cells to offer beneficial effects. The so-called clinical studies of the alpine rose extracts discussed in Ex. 13 to Mr. Deckner's declaration suffered all of the same faults as discussed earlier – no placebo, no blinding, and no statistical analysis of significance.

23.     I have been informed that another manufacturer, Naolys, is the supplier of stem cell isolates used by Peter Thomas Roth. Its marketing materials make claims for products derived from several rose varieties, found in Ex. 15 to Mr. Deckner's declaration. Their studies include two parts, with the "clinical testing" based on patient-reported observations, which are highly subjective. This assessment is completely unreliable scientifically and offers no evidence concerning efficacy. Again, the "in vitro testing" gives results without describing the methods used to obtain them. These studies appear similar to laboratory tests described earlier, which fail

10

to meet scientific standards required for peer review, so these reports suffer the same shortcomings, that there is no relevance to reported skin therapy because the studies bathe cells in the product. They also report a "clinical study" where a dermatologist scored the patient's complexion. These studies are faulty because they lack a placebo control, have no blinding, and show no statistics that can be used to evaluate whether results are statistically significant.

24.     More data is provided on some in vitro testing against keratinocytes (the outermost skin cells), but this work is again done in the laboratory, not on patient skin. In all of their reports, no statistics are shown to evaluate whether results are statistically significant. A study of the effect of their extract on melanin production used an in vitro test against a pure enzyme, tyrosinase. These data cannot be used to indicate cosmetic utility because substances in the extract would have to penetrate the skin and then enter skin cells to reach the enzyme, both of which are not plausible for any compounds in a water-based extract of stem cells.

25.     Faulty logic befalls another Naolys product claim. Their HydraGeneration Pale rose product was claimed to have significant hydrating effects on skin. Its form is listed as cells in glycerin or sunflower oil, yet in its commercial name, it is described as a leaf cell extract. As earlier discussed, dead plant stem cells themselves can have no utility in a cosmetic product. These reports are at least confused about what they involve, if not outright fabrications. Missing from this study is a negative control. The hydrating effect of the glycerin or oil without the cells would need to be studied as well. Glycerin in particular is a well-known humectant found in many cosmetic moisturizers. Studies of water retention in the skin again lack statistics to evaluate the significance of the result. Studies of cell proliferation and differentiation lack statistics and are unclear whether controls are treated vs. untreated or treated with extract in its vehicle vs. just the vehicle.

26.     Another Naolys product, from Damas rose, is claimed effective based on subjective self-reports and in vitro testing that has no relevance to the effects of a product on skin. There is also no statistical analysis of the data. It is notable that this product is claimed to stimulate the synthesis of collagen, an act that caused Sircuit Skin to receive a warning letter from the FDA because of the unproven claim.

11

27.    Criticisms along essentially identical lines are readily made of other Naolys stem cell products, Revive Commiphora and Apothercary's Rose.

28.    All of the objections raised here to the concept of plant stem cell-based cosmetics are also held by Paula Begoun, the author of over 20 books on skincare and makeup. Her detailed criticism of the use of plant stem cells to fight aging cites 5 publications in the peer-reviewed scientific literature.[13] Her opinions contrast to several authorities cited in Mr. Deckner's ¶57 and ¶58, whose statements are found in marketing materials and on commercial websites.

29.    In summary, Mr. Deckner has failed to present any convincing evidence that plant stem cell materials "repair", "regenerate", or "rejuvenate" human skin cells as claimed by Defendants. Furthermore, analysis of the claims made based on scientific principles also leads to the conclusion that plant stem cell could not offer the benefits claimed.

---

[13] https://www.paulaschoice.com/expert-advice/skincare-advice/anti-aging-wrinkles/stem-cells-anti-aging.html, accessed 11/28/19.

12

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: November 26, 2019

_____
Michael Pirrung, Ph.D.

_____

13